Okay, the next case on the call is 5-19-436 and it's the Interest of G.W.W. Thank you, Attorney General Chick Renito for the accountant, J.W. May it please the Justices, McCoy and Bailey. This case falls more on a best interest argument than anything else. And the reason I say that is you've got an individual that hit rock bottom, respondent father, admits it throughout the juvenile proceedings, admits it in the termination proceedings. He was an addict and was at his worst in April of 2018 when the child was removed during that time frame. Adjudication occurred on April 13th. Shortly after that adjudication, he was arrested for his first felony and only felony offense that he has been arrested for and or convicted of in his lifetime, which resulted or at least was contributed to by his addiction problem. It was a drug-induced homicide. They were at his house and all of them were abusing. He knows he had a problem. He's admitted that he had a problem. He has sought help for the problem and served his time for that crime. When you're looking at this case, he was due, we had the hearing on September 20th of 2019 for termination. It was filed for a motion to terminate in June of 19. He was due to be released from the Department of Corrections at the time of the hearing in mid to late November of 2019. Due to his participation in programs and education at the correctional facility. What the respondent father in this case was faced with was he had no services available to him at all until he reached the correctional facility. While he was in the Bond County Jail, and it's documented well throughout the entire case, there were no services available. Once he hit Department of Corrections, he had limited services available. But he availed himself to what was available and started participating in everything that he could get into. He got himself on a wait list and presented proof at the hearing that he had participated and was still participating in his substance abuse programs. He had done what they called the adult basic education. Within the program that he was doing, there was components of not only the substance abuse, but the parenting. So the only thing that he was not able to get at that point was the mental health counseling and it wasn't available to him. One of the accounts was that nine month period, that very first nine month period before he was incarcerated, right? No, actually he was incarcerated during that nine month period. So he was, the adjudication occurred on April 13th of 2018. He was incarcerated at the Bond County Jail beginning on April 21st of 2018. Oh, okay, that's right. And was in Bond County Jail until approximately November of 2018 when he went to the Department of Corrections and was receiving at Graham Correctional Center for the 30 days or so. And then he went to Jacksonville Correctional Center in December of 2018. But that first nine months where the court found that he had failed to make reasonable progress was a time when there were no services available. Is that true? That is true. And the case law, at least, seems to indicate that whether or not there are services available doesn't matter. I do not dispute that. That's why I indicated when I started my argument today that this is more of a bad interest argument because he was unable. His fault, he was unable to perform services during that first nine month period. It's hard for me to argue anything else the case law does support that it doesn't matter whether they're incarcerated. So what I would be arguing and kind of pointing out, if you look at the juvenile code, there's different provisions under the act that allow for termination. One of those provisions is that they're going to be incarcerated for a period more than two years. It's almost contradicting to say, well, we're only going to provide in the statute for termination for a parent that's incarcerated for more than two years, but we're going to terminate on a parent that's incarcerated for, you know, a shorter time frame because they didn't perform within that first nine month period and make progress when nothing was available.  Do you think that's a constitutional argument that perhaps should be applied in the future? I guess I couldn't argue that yet. I mean, he. I mean, that's really what you're. It's not raised, obviously, but as I sit and think about it, what do you do when there are no services available? Right. There's no. I mean, do you have due process? You have no services available. You have no way to correct the conditions. The goal of your juvenile abuse neglect code is family reunification. You're making it impossible in that situation. And they provide for situations when the period's a lengthier period and there's not a possibility of that reunification. But here you had an individual that as soon as those services were available, even though they were after that first nine month period, began to avail themselves immediately of those services. But just the clock had run out. I guess, you know, it could be argued that he could have pled guilty earlier. He could have worked out the case earlier to get to the Department of Corrections where the services are available. But he shouldn't have to give up his due process rights in one case to be able to get services in another case. This isn't a situation where he says nothing's my fault. He's admitted the fault. The travesty of the situation is he spiraled out of control and he hit rock bottom in April 2018 around that time frame. This is the first time he ever had a felony arrest, a felony conviction. This is his first incarceration. I understand it's a bad one. First time to get caught. Yes. I mean, when you're in an addiction situation, they're likely committing felonies every day on a daily basis. That's right. That's the point. Right. But it's not a repeat offender who had been in and out of the Department of Corrections his entire lifetime, I guess is what my point is. Because the case law does talk about repeat offenders that are continuously incarcerated and use that as one of the grounds kind of when they're assessing the cases. This individual is not one of your repeat offenders who has been in the system over and over. A repeat non-caught offender, that's what you're saying. Yeah, at that point, I mean, that was his first touch with law. There was evidence that throughout the case, the bond between the father and the son was a good bond. There was counselors that had went to bat to get the visitation set up for the father and the minor. Because in the beginning, the court was restricting that visitation, which would be one of the only tools that he had at that point for the reunification. The father had to bring an action in the court, a motion in the court, just to get that visitation, and he was backed by the minor's counselor. I would point out that that should be a factor in this case. Because if the court affirms the termination of his rights, his rights are cut off. There is no, hey, you can come see him every other weekend or anything of that nature. And even though this was a relative foster placement, it was relatives of the mother. And there's evidence in the testimony that this foster placement did not try to foster that relationship between father and the minor. The grandpa was pretty adamant that he didn't want the child speaking to the father. And when you're a foster parent, one of your duties as a foster parent is to try to help with that reunification process and to keep those bonds in place. Was there a guardian at line appointed in this case? I'm sorry? Was there a guardian at line appointed? There was. And was there a report filed by this guardian? No, he did not file a report. There was no recommendations? Just in court. Was there an interview of the minors? He did interview the minors and met with them pursuant to the statute. And then, you know, just verbal recommendations within court. And that's within the record. Okay. What was their preference? The guardian at line I'm sorry, was the state. No, I mean the children. I'm sorry, the children. The children, well, there were two children involved kind of in this situation. However, one was not the biological son of my clients. So there were stepbrothers. The biological son of my clients, it's my understanding, wanted to continue to have a relationship with my clients. But the guardian at line took the stance that it would be more important to keep the two boys together. Now, my client indicated on the record in the termination proceedings that he had no intention of severing that tie and would try to keep fostering that relationship if he were allowed the time to work through his services and regain the custody of his minor child. I just want to make sure I've sufficiently answered your question in regards to the guardian at line. So that was more, that was kind of the main argument, I believe, from the guardian at line. You've got a situation where it's not perfect. You've got two children, one mom, two different dads. You see this a lot in today's area. So just to kind of go into that factor, because the guardian at line put a lot of weight on that factor. And I understand it because you don't want to sever those ties. And my client agreed with that. However, to terminate his rights, you're severing the ties between his son and himself and his family. To kind of parallel this argument, if you're looking at, because the Juvenile Code and the Marital Dissolution Act kind of go hand in hand in a lot of factors, there are 17 different factors under the Marital Dissolution Act. And one of the 17 is the relationship with the siblings. That's only one of the 17, and not one factor is supposed to be given more weight than the other factor. Within that same argument, you would have the relationship with the father should be given just as much weight as the relationship with the siblings. So the mother is going to still be allowed to visit with her children because of the maternal grandparents? That's my understanding. Now, the mother had surrendered her rights, or had been terminated. I'm sorry, not surrendered. But she's in a different situation where the children are with her biological parents, which makes it? It's awkward. Yes. Makes it where her ties and her relationship isn't ever going to be 100% severed. In timing of this, if you go and you kind of look in the record, kind of read between the lines, not that this is what it should fall out on, but we didn't file the motion to terminate for failing to miss that nine-month period until after mom had been released from custody, had been given a chance to complete her services after she was released on her felony charges, and she failed. And as soon as she failed, that's when the motion to terminate parental rights was filed by the state. This isn't about argument, but my client's position was, I want that same opportunity. I want that same opportunity to be able to get out and show them that I can continue completing my services. I will comply with all the service plan and to restore myself to fitness. And he just did not have that opportunity. And I believe that he would have been given that opportunity had mom not failed in her services. So what's – I can't argue that the nine-month periods were met, but what I can argue is that this is a best interest case. And it's not in the best interest to sever a relationship between a minor child and a father that had a clear bond, that the father, as soon as services were made available to him, began doing everything that he could. It's uncontroverted that he started doing his services and got on the list as soon as he was in the Department of Corrections. It was well documented that the services were not available to him until he reached the Department of Corrections. So it was made very clear in the record that he was not – intentionally not doing anything. Thank you, counsel. Thank you. Good morning, everyone. Please support counsel. Good morning. For the record, my name is Patrick Daly. I'm here on behalf of the state. I fully appreciate the concerns that respondents' counsel has with regards to the ability to complete services while incarcerated. I've seen this in other cases as well. One of the problems with that argument – not a problem, but one of the perhaps repercussions of the argument is I've seen kind of come out here today a bit of a conflation of issues here of fitness and best interests. And they are two very distinct and discrete considerations for the trial court. And a lot of the focus of the respondent this morning has been upon the respondent himself. You know, I want this. I can't do this. I think you have this. And the unfitness stage is geared towards the constitutional rights of the parent. I think Justice Cates makes an interesting comment about, you know, we've got this kind of interesting sort of parallel here with, you know, statutory provisions for incarceration, whereas here, you know, the Supreme Court has spoken that there's – by virtue of a statutory interpretation, there's no tolling provision for incarceration under the reasonable progress standard. I would note that this case is 10 years old now. The Juvenile Court Act has been amended many, many times in the interim, and they have not even in light of it, JL, changed that statute. So apparently it's reflective of at least some kind of, you know, legislative fiat that this is how they want things to be handled at the unfitness stage. But at the best interest stage, the focus of the court shifts from the parent to the child. It's the child's interests that are paramount. And in consideration of the child's interests, we don't just look at the respondent's wishes or desires, but we have to look at what's going to be in the best interest of the child, and that is taking a look at the entirety of the evidence that was presented before the court. This court has, of course, will have the opportunity to review the best interest hearing in this case, and the manifest way to stand in the review applies here. There is a statutory provision, 705 ILCS 405-1-3, Perens 4.05, which lists certain considerations or factors that the trial court has to take, you know, under advisement in considering the evidence and determining what is in the best interest. I think it's important to look at some of the historical background of the respondent here, though, in that regard. He clearly has – well, let me just say this up front, so we're all for the best. I think that he's trying, and that's something that we can't always say about individuals that we have in court. But these children, this child grew up in an environment that was perilous, to say the least. Both parents were serious drug abusers. The respondent showed up for the adjudicatory hearing either high or coming off high. He tested positive for fentanyl and cocaine and marijuana and, you know, had the – with the parents to get a drug deal in St. Louis. The child was picked up from a drug house. Dad was off buying drugs, and the child was dressed in a Halloween costume and nothing else, basically. The child recalled medicine or her father OD'd, and he had to be revived by his mother. These are – this is the environment that this child came from. When the child came to the foster parents – and what's unique about this is it's a blood relative. It's the maternal grandparents. And reunification of the minor with a half sibling, something that was of great happiness and joy for the minor in this case. But the child denied the concept of a proper diet. It indicated he ate out of cans. Canned food or chicken McNuggets was basically the entirety of the diet. I understand that the respondent disputed this, but this was the evidence before the court. Had been held back in school, was behind the curve educationally, but here now engaged with a loving family. It was a nurturing family, was reunited with a half sibling, was seeing a counselor, was excelling in school, was engaging in activities with the family. And by all accounts, over the course of what the prosecutor stated was about 559 days of substitute care, had clearly bonded with the foster family. In fact, the guardian ad litem stated that it would be an understatement to say that this minor wants to continue to live with the bones. We look at these considerations and then weigh them against the respondent. He's trying, granted, but even from the testimony that we get, there's a lot more uncertainty than certainty when it comes to the respondent. He still hasn't completed drug counseling by his own admission. He hasn't demonstrated any ability to live a drug-free life outside of the prison milieu. Now a respondent will say, well, that's because how could I do that? I'm incarcerated. But you're incarcerated, and we all live with the products of the decisions or bad decisions that we make in our lives. And here, where the best interest of the minor is the important singular consideration of the court at the best interest stage. It's not going to do anybody any good to say, well, poor respondent, how can you get anything done? That's what we have, and that's the situation. And his housing and employment situation is very uncertain as well. He indicated his plans were to live with a sister in a different state and continue to see a minister to help with his spiritual and psychological needs. And all this is well and good, but the court has to weigh these against the environment that this child is currently in of blood relatives willing and able to adopt, to have an intact family unit with a half-sibling. These are factors that the court simply can't ignore and weighs strongly in favor of the court's ultimate decision in the best interest of this case. And in that regard, the state's burden was met both with regards to the fitness and the best interest stage and the court's determination that termination is in the best interest of this minor. It's an obvious and manifest way it should be affirmed by this court. Does the court have any questions? Thank you, Your Honor. There's no questions. Thank you. Ms. Butler? Thank you. Just to touch on a couple of things that he brought up, the reason for the case was substance use and neglect of the children. That's undisputed, and it's admitted by my client throughout the entire case and at the termination hearing. He's admitted that he did not perform as a parent as he should. Every juvenile case has the underlying issue of parents having, abusing and or neglecting their children, unless, of course, it's a dependency matter. But in the abuse and neglect, there is either drug abuse or domestic violence, or there's some reason that that child came into care. The system set up to correct those conditions, to keep those families together and try to reunify, if at all possible, is a last resort to terminate the parental rights and cut those family ties. So, undisputed that the reason that what the child was living in was horrific when he came into care. That's the reason he came into care. With respect to the respondent father not having been outside the prison to show that he could live a drug-free life or any of that, he had at least had the foresight to reach out to people, develop a support system, acknowledge he was an addict, realize he needed something when he was released and not, I'm just going to get out and everything's going to be fine. He knew there were things that he would continue to have to address upon his release, and he was putting those plans in place and testified to those facts. In fact, he had not only the plan where he could live with the sister in Missouri, but he had a possible relative that he could go back to in the Greenville-Lawn County area based on the situation and what would be in the best interest of his child was what he was trying to place his parole plans on. There was a lot of talk for me and argument for me about what the respondent was doing, what he could do, what he couldn't do, but that comes to the best interest of the child. It's important for a child to have a relationship, if it's possible and it's healthy, with that child's parents, and that's what the respondent was working for in this situation to restore himself to fitness. He had some obstacles in his way. He created those obstacles, but at least he was taking the right steps as soon as he got the opportunity to correct the situation that got him where he was at. How old is the child now? He is, I think, 11. I get the two mixed up. I apologize. No problem. It's been going on a long time. He's an older child, and he's had a back and forth. The statement that this case has been going on for 10 years, I'm not going to get into that statement. It started in 2018. The petition. Correct. Correct. So the case hasn't been pending for 10 years. I just wanted to clarify that issue. We're talking about the appellate court, not the trial court. Is that what you're saying? No, the juvenile court case in the trial court was pending since 2018 or earlier. I think the reference may have been to the fact that the family was involved with services for a long time. I'm not going to put words in his mouth, but I'm assuming that's what he meant. So, you know, there's... I think Clara's answer is really good. Guilty. Guilty. I was talking about the Supreme Court's decision was pending. I apologize. I apologize. Okay. So we were all wrong. Oh, I didn't see that. That was good. That was a good answer. So when it comes to the best interest of the child, what is the best interest? The best interest is to have the things in life that he needs, a stable home, food, his education, everything a child needs to thrive. That's going to be in that child's best interest. Well, no, at the time of the hearing, was the father employed and did the father have a stable home? At the time of the termination hearing? Yes. No, he was incarcerated. The termination hearing was on September 20th of 2019. He was to be released on November of 19. Okay, thank you. No problem. So he was not employed at that point. And he was, although he had not finished the substance abuse program as indicated by counsel, he was close to the end of it. He had progressed in it and actually excelled. Thank you. Thank you. Please let me take another advice. Thank you. Part of being in a good court.